Flor Barawid, In Pro Se
Jaime Barawid, In Pro Se
1718 E. Valley Parkway, Suite J
Escondido, CA 92027
Tel: (760) 802-4537

2012 APR 27  A 10 45

2:12-cv-00707-RCJ -CWH

# UNITED STATES FEDERAL COURT

## DISTRICT OF NEVADA

JAIME BARAWID and FLOR DE LYS
BARAWID, individuals, on behalf of
themselves and all others similarly situated.

                  Plaintiffs,

v.

COUNTRYWIDE BANK, FSB, as the
Original Lender; TRUSTEE, as the Original
Trustee; FIDELITY NATIONAL TITLE
Title Company; SAXON
MORTGAGESERVICES, INC., as the
Servicer; BEAR STEARNS & CO., INC.,
FTN FINANCIAL CAPITAL, BLAYLOCK
& PARTNERS, LP, DEUTSCHE BANK
SECURITIES, and VINING-SPARKS IBG,
LP, as a Joint Book Running Managers;
FEDERAL NATIONAL MORTGAGE
ASSOCIATION, as PSA Issuer and
Administrator; CAPITAL RESEARCH
AND MANAGEMENT COMPANY, and
THE GROWTH FUND OF AMERICA,
INC, as PSA Filer; RECONTRUST
COMPANY, as the Foreclosing Trustee;
ANGELA NAVA, as Assistant Secretary of
MERS Inc., CHRISTOPHER WILLIAMS,
as Notary of Assignment of Deed of Trust;
KATHY NEWLAND, as Signatory for
Trustee Deed Upon Sale, KARIN MORRIS,
the Notary of the Trustee Deed Upon Sale;
and DOES 1 THROUGH 10, INCLUSIVE
                  Defendants,

CASE NO

**COMPLAINT VERIFIED**
DAMAGES EXCESS $25,000

**DEMAND JURY TRIAL**

1. **LACK OF STANDING TO FORECLOSE**
2. **FRAUD IN THE CONCEALMENT**
3. **FRAUD IN THE INDUCEMENT**
4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
5. **SLANDER OF TITLE**
6. **DECLARATORY RELIEF**
7. **VIOLATIONS OF NEVADA CIVIL CODE SECTION 106.290 & 107.026, et seq.**
8. **VIOLATION OF NEVADA UNFAIR TRADE PRACTICES (NRS CHAPTER 598A)**
9. **CIVIL RICO**

COMES NOW the Plaintiffs, JAIME BARAWID AND FLOR DE LYS BARAWID ("Plaintiffs'),

complaining of the Defendants, and each of them, as follows:

## JURISDICTION AND VENUE

1.  Jurisdiction for this action is properly founded in the Eight District Court, County of

Clark, Nevada.

2.  The underlying property of this controversy is located in the jurisdiction of Eight

District Court, County of Clark, Nevada.

3.  The Clark County is the location of the real property, located at 11037 MEZZANA

STREET, LAS VEGAS, NV 89141 ("SUBJECT PROPERTY").

## INTRODUCTION

4.  This is an action brought by Plaintiffs for declaratory judgment, injunctive and equitable

relief, and for compensatory, special, general and punitive damages.

5.  Plaintiffs, homeowners, dispute the title and ownership of the real property in question

(the "Home"), which is the subject of this action, in that the originating mortgage lender, and others

alleged to have ownership, have unlawfully sold, assigned and/or transferred their ownership and

security interest in a Promissory Note and Deed of trust related to the Property, and thus, do not

have lawful ownership or a security interest in Plaintiffs' Home which is described in detail herein.

6.  Plaintiffs allege that Defendants, and each of them, cannot show proper receipt,

possession, transfer, negotiations, assignment and ownership of the borrower's original Promissory

Note and Deed of Trust, resulting in imperfect security interests and claims.

7.  Plaintiffs further alleges that Defendants, and each of them, cannot establish possession

and proper transfer and/or endorsement of the Promissory Note and proper assignment of the Deed

of Trust herein; therefore, none of the Defendants have perfected my claim of title or security

interest in the Property.  Defendants have perfected any claim of title or security interest in the

Property.  Defendants, and each of them, do not have the ability to establish that the mortgages that secure the indebtedness, or Note, were legally or properly acquired.

8.  Plaintiffs allege that an actual controversy has arisen and now exists between the Plaintiffs and Defendants, and each of them.   Plaintiffs desire a judicial determination and declaration of its rights with regard to the Property and the corresponding Promissory Note and Deed of Trust.

9.  Plaintiffs also seek redress from Defendants identified herein below for damages, for other injunctive relief, and for cancellation of written instruments based upon:

   a.  An invalid and unperfected security interest in Plaintiffs' Home hereinafter described;

   b.  Void "True Sale(s)" violating express terms of the **FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I** ("PSA") governing the securitization of Plaintiffs; mortgage, which is a Trust Agreement required to be filed under penalty of perjury with the United States Securities and Exchange Commission ("SEC") and which, along with another document, the Mortgage Loan Purchase Agreement ("MLPA"), is the operative securitization document created by the finance and securitization industry to memorialize securitization transaction (see further discussion of the PSA herein);

   c.  An incomplete and ineffectual perfection of a security interest in Plaintiffs' Home;

   d.  VIOLATION OF NEVADA UNFAIR TRADE PRACTICES (NRS CHAPTER 598A) and

   e.  A void or voidable Deed of Trust due to improper securitization, for which there is a reasonable apprehension that, if left outstanding, may cause a serious injury.

### THE PARTIES

10. Plaintiffs are now, and at all times relevant to this action, residents of the County of Clark, State of Nevada.

11. The Plaintiffs may bring in or consolidate with this case other persons who are similarly situated to Plaintiffs identified above.  Further, at all times material hereto, any of the Defendants have acted in the same or in another capacity with respect to loan processing.  All of the foregoing secured real estate loans made to Plaintiffs were wrongfully and handled and processed by Defendants, resulting in damages.  From time-to-time, upon conducting the due diligence and learning the information sufficient to add remaining Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional Plaintiffs, or will follow such other process as is prescribed by the Court. In the event Plaintiffs believe it is in furtherance of judicial economy and justice to add all or any of these additional persons to this Complaint, Plaintiffs shall bring a noticed motion and to add such parties to this action or follow such procedure as the Court in this case may specify.  In the event Plaintiffs file a separate lawsuit appertaining to all or any of these persons, or such further number as may exist in view of future developments, Plaintiffs shall file all appropriate Notices of Related Cases in accordance with Nevada law, or as otherwise directed by the Court.

12. Defendant COUNTRYWIDE BANK, FSB, ("ORIGINAL LENDER") is doing business in the County of Clark, State of Nevada.  Plaintiffs are further informed and believe, and thereon allege, that "ORIGINAL LENDER", is the Originator of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.  Plaintiffs are further informed and believe that the "ORIGINAL LENDER" is a participant in fraud on the Plaintiff in the origination of the note.

4
COMPLAINT

13. Defendant, FIDELITY NATIONAL TITLE, as the "TITLE COMPANY" who oversee the recording and processing of both Deed of Trust and Promissory Note is doing business in Clark, State of California.  Plaintiffs are further informed and believe, thereon allege, that the Original Trustee and Title Company of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.  Plaintiffs are further informed and believe that the "TITLE COMPANY" is a participant in fraud on the Plaintiff in the origination of the note.

14. Defendant, Trustee, as the "ORIGINAL TRUSTEE" who oversee the recording and processing of both Deed of Trust and Promissory Note is doing business in Clark, State of Nevada.  Plaintiffs are further informed and believe, thereon allege, that the Original Trustee and Title Company of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.  Plaintiffs are further informed and believe that the "ORIGINAL TRUSTEE" is a participant in fraud on the Plaintiff in the origination of the note.

15. Defendant, BEAR STEARNS & CO., INC., FTN FINANCIAL CAPITAL, BLAYLOCK & PARTNERS, LP, DEUTSCHE BANK SECURITIES, and VINING-SPARKS IBG, LP ("JOINT BOOK RUNNING MANAGERS" or the PSA Sponsor and Depositor), is doing business in the County of Clark, State of Nevada.  Plaintiffs are further informed and believe, and thereon allege, that PSA Sponsor and Depositor" is the present purported Securitization Seller of a portion of the mortgage loans.  The remainder of the mortgage loans will be sold directly to the depositors by one or more special purpose entities that were established by "DEPOSITOR" which, in turn, acquired those mortgage loans directly from "ORIGINAL LENDER" herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein)

and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

16. Defendant, CAPITAL RESEARCH AND MANAGEMENT COMPANY, and THE GROWTH FUND OF AMERICA, INC, ("PSA Filers"), is doing business in the County of Clark, State of Nevada. Plaintiffs are further informed and believe, and thereon allege, that PSA Filers" is the present purported Securitization of a portion or as a whole of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositors by one or more special purpose entities that were established by "DEPOSITOR" which, in turn, acquired those mortgage loans directly from "ORIGINAL LENDER" herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

17. Defendant, Saxon MortgageServices, Inc. ("PSA SERVICER"), is a National Banking Association, doing business in the County of Clark, State of Nevada. Plaintiffs are further informed and believe, and thereon allege, that "PSA SERVICER", is the present purported Master Servicer of the mortgage herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

18. Defendant, FEDERAL NATIONAL MORTGAGE ASSOCIATION ("PSA Administrator"), is doing business in the County of Clark, State of Nevada. Plaintiffs are further informed and believe, and thereon allege, that "PSA Administrator", is the present purported PSA Issuer of the mortgage herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

19. Defendant, RECONTRUST COMPANY ("FORECLOSING TRUSTEE"), Plaintiffs are

informed and believe, and thereon allege, is a national financial services association and doing business in the County of Clark, State of Nevada and is the purported "FORECLOSING TRUSTEE" of the mortgage herein and/or a purported participant in the imperfect securitization of the Note and/or the Deed of Trust as more particularly described in this Complaint.

20. Defendant, ANGELA NAVA, as Executor of the recorded Assignment of Deed of Trust as Assistant Secretary of Mortgage Electronic Registration Systems, Inc., suspected as Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

21. Defendant, CHRISTOPHER WILLIAMS, as Notary of the recorded Assignment of Deed of Trust suspected as the accomplish of the Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

22. Defendant, KATHY NEWLAND, as Executor of the recorded Trustee Deed Upon Sale Assistant Secretary of Recontrust Company, N.A., suspected as Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

23. Defendant, KARIN MORRIS, as Notary of the recorded Trustee Deed Upon Sale., suspected as the accomplish of the Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint

24. At all times relevant to this action, Plaintiffs have owned the Property located at 11037

MEZZANA STREET, LAS VEGAS, NV 89141 (the "Property").

25. Plaintiffs do not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 10, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiffs, or claims some right, title, or interest in the Property.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe, and therefore allege, that all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiffs so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

26. Plaintiffs are informed and believe, and thereon allege, that's at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## JURISDICTION

2.  This Court has original jurisdiction over the claims in this action based on 28 U.S.C. §§ 1331, 1332, 1343, and 42 U.S.C. §1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law and matters between diverse citizens that involve an amount in controversy in excess of $75,000.00. This Court also has supplemental jurisdiction over the pendant state law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. §1367.

3.  The unlawful conduct, illegal practices, and acts complained of and - alleged in this Complaint were all committed in the Federal District of Nevada and the involved real property located in the Federal District of Nevada. Therefore, venue properly lies in this District, pursuant to 12 U.S.C. §2614 and 28 U.S.C. §1391(b).

4. Plaintiffs are ignorant of the true identity and capacity of defendants designated as Does 1-100, but will amend the Complaint when their identities have been ascertained according to proof at the time of trial. Plaintiffs allege on information and belief, however, that each and every Doe Defendant is in some manner responsible for the acts, and conduct of the other defendants, and were, and are responsible for the injuries, damages, and harm, incurred by Plaintiffs. Plaintiffs further allege on information and belief that each such designated defendant acted, and acts, as the authorized agent, representative, and associate of the other defendants in doing the things alleged herein. >

5. Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants.

6. Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

7. At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of the other.

27. At all relevant times, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

## FACTUAL ALLEGATIONS

28. Plaintiffs executed a series of documents, including but not limited to a Note and Deed of Trust, securing the Property in the amount of note. The original beneficiary and nominee under the Deed of Trust was "ORIGINAL LENDER".

29. Plaintiffs are informed and believe, and thereon allege, that this loan was securitized, with the Note not being properly transferred to Defendant, "PSA SERVICER", acting as the Servicer for the Securitized Trust. As set forth herein above, the Securitized Trust was formed by execution of the PSA.

30. Plaintiffs are informed and believe, and thereon allege, that the purchase mortgage on the Property, the debt or obligation evidenced by the Note and the Deed of Trust executed by Plaintiffs in favor of the original lender and other Defendants, regarding the Property, was not properly assigned and transferred to Defendants operating the pooled mortgage funds or trusts in accordance with the PSA of the entities making and receiving the purported assignments to this trust.

### MERS as Beneficiary on the Deed of Trust

31. The creation of MERS changed the lending process. Instead of the lender being the Beneficiary on the Deed of Trust, MERS was now named as either the "Beneficiary" or the "Nominee for the Beneficiary" on the Deed of Trust. The concept was that with MERS assuming this role, there would be no need for Assignments of the Deed of Trust, since MERS would be given the "power of sale" through the Deed of Trust.

32. The naming of MERS as the Beneficiary meant that certain other procedures had to change. This was a result of the Note actually being made out to the lender, and not to MERS. Before explaining this change, it would be wise to explain the Securitization process.

33. As mentioned previously, Securitization and MERS required many changes in established practices. These practices were not and have not been codified, so they are major points

of contention today.

34. One of the first issues to be addressed was how MERS might foreclose on a property. This was "solved" through an "unusual" practice.

> MERS has only 44 employees. They are all "overhead", administrative or legal personnel. How could they handle the load of foreclosures, Assignments, etc. to be expected of a company with their duties and obligations? When a lender, Title Company, Foreclosure Company or other firm signed up to become a member of MERS, one or more of their people were designated as "Corporate Officers" of MERS and given the title of either Assistant Secretary or Vice President. These personnel were not employed by MERS, nor received income from MERS. They were been named "Officers" solely for the purpose of signing foreclosure and other legal documents in the name of MERS. (Apparently, there are some agreements which "authorize" these people to act in an Agency manner for MERS.)

34.     This "solved" the issue of not having enough personnel to conduct necessary actions. It would be the Servicers, Trustees and Title Companies conducting the day-to-day operations needed for MERS to function. As well, it was thought that this would provide MERS and their "Corporate Officers" with the "legal standing" to foreclose. However, this brought up another issue that now needed addressing:

> When a Note is transferred, it must be endorsed and signed, in the manner of a person signing his paycheck over to another party. Customary procedure was to endorse it as "Pay to the Order of" and the name of the party taking the Note and then signed by the endorsing party. With a new party holding the Note, there would now need to be an Assignment of the Debt. This could not work if MERS was to be the foreclosing party.

The promissory note was made payable to Countrywide Bank, FSB.  No record document suggests that it has been indorsed to MERS or any other named entity.

35. Once a name is placed into the endorsement of the Note, then that person has the beneficial interest in the Note. Any attempt by MERS to foreclose in the MERS name would result in a challenge to the foreclosure since the Note was owned by "ABC" and MERS was the "Beneficiary". MERS would not have the legal standing to foreclose, since only the "person of interest" would have such authority. So, it was decided that the Note would be endorsed "in blank",

which effectively made the Note a "Bearer Bond", and anyone holding the Note would have the "legal standing" to enforce the Note under Uniform Commercial Code. This would also suggest that Assignments would not be necessary.

36. MERS has recognized the Note Endorsement problem and on their website, stated that they could be the foreclosing party only if the Note was endorsed in blank. If it was endorsed to another party, then that party would be the foreclosing party. As is readily apparent, the above statute would suggest that Assignment is a requirement for enforcing foreclosure. The question now becomes as to whether a Note Endorsed in Blank and transferred to different entities as indicated previously does allow for foreclosure. If MERS is the foreclosing authority but has no entitlement to payment of the money, how could they foreclose? *__This is especially true if the true beneficiary is not known. Why raise the question of who the true beneficiary is? Again, from the MERS website........__*

> "On MERS loans, MERS will show as the beneficiary of record. Foreclosures should be commenced in the name of MERS. To effectuate this process, MERS has allowed each servicer to choose a select number of its own employees to act as officers for MERS. Through this process, appropriate documents may be executed at the servicer's site on behalf of MERS by the same servicing employee that signs foreclosure documents for non-MERS loans. Until the time of sale, the foreclosure is handled in same manner as non-MERS foreclosures. At the time of sale, if the property reverts, the Trustee's Deed Upon Sale will follow a different procedure. Since MERS acts as nominee for the true beneficiary, it is important that the Trustee's Deed Upon Sale be made in the name of the true beneficiary and not MERS. *__Your title company or MERS officer can easily determine the true beneficiary.__* Title companies have indicated that they will insure subsequent title when these procedures are followed."

37. There, you have it. Direct from the MERS website. They admit that they name people to sign documents in the name of MERS. Often, these are Title Company employees or others that have no knowledge of the actual loan and whether it is in default or not.

38. Even worse, MERS admits that they are not the true beneficiary of the loan. In fact, it is likely that MERS has no knowledge of the true beneficiary of the loan for whom they are

representing in an "Agency" relationship. They admit to this when they say "***Your title company or***

***MERS officer can easily determine the true beneficiary.***

39. In the case of MERS, the Note and the Deed of Trust are held by separate entities.

40. This very "simple" statement poses major issues. *To easily understand, if the Deed of Trust and the Note are not together with the same entity, then there can be no enforcement of the Note. The Deed of Trust enforces the Note. It provides the capability for the lender to foreclose on a property. If the Deed is separate from the Note, then enforcement, i.e. foreclosure cannot occur.* The following ruling summarizes this nicely.

41. In ***Saxon vs Hillery, CA, Dec 2008, Contra Costa County Superior Court***, an action by Saxon to foreclose on a property by lawsuit was dismissed due to lack of legal standing. This was because the Note and the Deed of Trust were "owned" by separate entities. The Court ruled that when the Note and Deed of Trust were separated, the enforceability of the Note was negated until rejoined.

42. The mortgage securing the note, while naming Countrywide Bank, FSB as "Lender," separately names the Mortgage Electronic Registration Systems, Inc. (MERS) as the "Mortgagee." The conveyancing language granted the mortgage to MERS "solely as nominee for Lender and Lender's successor's and assigns."

43. "ORIGINAL LENDER" was a "correspondent lender" that originated mortgage loans which in turn, was sold and transferred into a "federally-approved securitization" named **FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.**

44. The Note and Deed have taken two distinctly different paths. The Note was securitized into FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.

45. The written agreement that created the FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I is a matter of public record described in an

"Offering Circular," available on the Fannie Mae website.   The promissory note in this case became Fannie Mae property in compliance with the requirement set forth in the Offering Circular.   The acquisition of the assets of the subject Fannie Mae Fixed to Floating Rate Non-Cumulative Preferred Stock Series I and the Offering Circular are governed under the law.

46. Moreover, Fannie Mae is not required to register the Preferred Stock with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended. The shares of Preferred Stock are "exempted securities" within the meaning of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

47. The loan was originally made to FIRST MAGNUS FINANCIAL CORPORATION and was sold and transferred to FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.  There is no record of Assignments from the original lender First Magnus Financial Corporation Loan to Fannie Mae.

48. In *Carpenter v. Longan* 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), *the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident.  An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*

> An obligation can exist with or without security.  With no security, the obligation is unsecured but still valid.  A security interest, however, cannot exist without an underlying existing obligation.  It is impossible to define security apart from its relationship to the promise or obligation it secures.  If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically.  If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685)

> "Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)

49.   By statute, assignment of the mortgage carries with it the assignment of the debt. . .

Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose*, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*"

50.   ANY ATTEMPT TO TRANSFER THE BENEFICIAL INTEREST OF A TRUST DEED WITHOUT OWNERSHIP OF THE UNDERLYING NOTE IS VOID UNDER NEVADA LAW.

51. Plaintiffs, therefore, allege, upon information and belief, that none of the parties to neither the securitization transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

**FIRST CAUSE OF ACTION**
**LACK OF STANDING**
**(AGAINST ALL DEFENDANTS)**

52. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

53. An actual controversy has arisen and now exists between Plaintiffs and Defendants specified hereinabove, regarding their respective rights and duties, in that Plaintiffs contend that Defendants, and each of them, do not have the right to foreclose on the Property because Defendants, and each of them, have failed to perfect any security interest in the Property. Thus, the

purported power of sale by the above specified Defendants, and each of them, no longer applies. Plaintiffs further contend that the above specified Defendants, and each of them, do not have the right to foreclose on the Property because said Defendants, and each of them, did not properly comply with the terms of Defendants' own securitization requirements and falsely or fraudulently prepared documents required for Defendants, and each of them, to foreclose as a calculated and fraudulent business practice.

54. Plaintiffs are informed and believe and there upon allege that the only individual who has standing to foreclose is the holder of the note because they have a beneficial interest. The only individuals who are the holder of the note are the certificate holders of the securitized trust because they are the end users and pay taxes on their interest gains; furthermore, all of the banks in the middle were paid in full.

55. Plaintiffs request that this Court find that the purported power of sale contained in the Note and Deed of Trust has no force and effect at this time, because Defendants' actions in the processing, handling and attempted foreclosure of this loan involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiffs to be at an equitable disadvantage to Defendants, and each of them. Plaintiffs further request that title to the Property remain in its name, with said Deed of Trust remaining in beneficiaries' name, during the pendency of this litigation, and deem that any attempted sale of the Property is "unlawful and void".

56. Defendants, and each of them, through the actions alleged above, have illegally commenced foreclosure under the Note on the Property via a foreclosure action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiffs great and irreparable injury in that real property is unique.

57. The wrongful conduct of the above specified Defendants, and each of them, unless

restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiffs. Plaintiffs will not have the beneficial use and enjoyment of its Home and will lose the Property.

58. Plaintiffs has not other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiffs. Plaintiffs have suffered and will continue to suffer in the future unless Defendants' wrongful conduct is restrained and enjoined because real property is inherently unique and it will be impossible for Plaintiffs to determine the precise amount of damage it will suffer.

## SECOND CAUSE OF ACTION

### DECEIT INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

59. Plaintiffs re-allege and incorporate by reference all preceding paragraph as though fully set forth herein.

60. The State of Nevada has statutorily prescribed non-judicial foreclosure procedures, in Sections §2924 et. seq. In the Cal. Civil. Code. Homes are normally foreclosed pursuant to the statutory power of sale, without a pre-foreclosure court hearing.

61. Pursuant to Statutory requirements, entities seeking to exercise a right of foreclosure pursuant to a Deed of Trust, [foreclosing on mortgages] must strictly comply with the State's Statutory Prerequisites to foreclosure.

62. The foreclosing entity must have actual assigned legal authority to file the Notice of Default ..the power of sale, Cal. Civil Code §725 a. §726. The statutory power of sale, ...in virtually all Nevada residential mortgages provides for foreclosure sales approve by the "beneficiary" and **by the trustee** named in a deed.. or if there be a successor trustee duly recorded, as in Section "§725 Cal. Civil Code.

63. Deed of Trusts, rights to exercise a power of sale by the Trustee and dictated by the owner of the note under the contract may be assigned, but a valid written assignment, consistent

with the statute of frauds, is a prerequisite to effectuate an assignment Section §2932.5 of the Nevada Code.

64. With the absence, defective or unperfected assignment or substitution, an entity attempting to avail of any rights of a Trustee, has no rights as a "trustee", and there is only one Trustee to act at a time. The trustee …or to send notices required by the statute of fraud, governing the Deed of Trust Contract acknowledged and signed by Plaintiff.

65. A foreclosing trustee and beneficial owner owe the mortgagor a duty of good faith and reasonable diligence in the foreclosure process. Failure to send a legally correct statutorily required notice is inconsistent with the duty of good faith and reasonable diligence.

66. Statute of frauds, Section §2932.5 Cal. Civil Code, dictates how an assignee, is required to possess such assignment in writing and record such.

67. The Defendants owed a duty of good faith and reasonable prudence while doing the diligence in the commencement and conduct of foreclosing proceedings.

68. The complexities of MERS, Securitization, Credit Default Swaps, Insurance Reimbursements, HAMP Monies, FDIC, and the AIG bailout make the tradition lending practices incongruent.

69. This is not the traditional model most everyone older than 40 grew up understanding. It is complex and has many side agreements.

70. The assignment of a mortgage without a transfer of the indebtedness confers no right, since debt and security are inseparable and the mortgage alone is not a subject of transfer. "A trust deed has no assignable quality independent of the debt; it may not be assigned or transferred apart from the debt; and an attempt to assign the trust deed without a transfer of the debt is without effect."

71. The Promissory Note is a negotiable instrument. Transferring a Deed of Trust by itself does not allow enforcement of the instrument unless the Promissory Note is properly negotiated. Where an instrument has been transferred, enforcement abilities based upon possession, Section §3301 (Cal. Com. Code) negotiable instrument. "Exhibit A-1" copy of the recorded Deed of Trust, Paragraph 20, mentions that ""*The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.*"

72. None of the Defendants are present holder of the instrument or are non holders in possession with rights of the holder. None of the Defendants are entitled to enforce the instrument Sections 3309 & 3418 sub. (d) of the Nevada Com. Code.

73. On _____ "Foreclosing Trustee" stated in the Notice of Default that: The present beneficiary under such deed of trust, has executed and delivered to said agent, ..Declaration of Default and Demand .. and has **deposited with said agent such deed of trust and all documents evidencing obligations secured** thereby, ... trust property to be sold to satisfy the obligations secured thereby.

74. Defendants have no enforceable rights under Cal. Com. Code 3301(a) and it is unknown where Plaintiff security interest is located. "Foreclosing Trustee" states they have the note and the Deed of Trust in a publically recorded document.

75. NY Trust Laws and IRS Tax Statutes suggest, as a matter of law, that this feat would cause a large tax burden by such acceptance into a tax exempt trust.

76. Defendants knew these actions were a false representation, done with the intent to deceive and induce reliance by Plaintiff, and others whereby the fruits of these inducements would inure to the enrichment and benefits to the defendants herein.

77. The Securities and Exchange filings for the NY Trust outlines proper legal procedure. Sections of the Pooling and Servicing Agreement as per "Exhibit A" presented in the Securitization Analysis Report, outline in detail procedures for proper processing of both the Deed of Trust and Notes, and placing them in trust in a recordable form. This specific step is necessary for the underwriting and insurance guarantees. This enforceable agreement demonstrates the deceit placed on this Court. This is an SEC regulated offering not a simple loan.

78. This Pooling and Servicing agreement further demonstrates deceit on this court. The assignment presented in the recording is untrue by operation of law. This Trust was closed to any substitutions after PSA Cut-off Date.

79. Assigning a defaulted loan into a tax sheltered fund would cause a major tax implication, tax impact to the shareholder into the millions of dollars, and in violation of the Securities Laws for which they used to register such an offering.

80. The deed of trust substitution is absolute trickery and a means to mislead the court and others into the devious and dishonest business practices these entity continue to propagate on innocent people such as Plaintiff.

81. Plaintiff has a document that states the "Original Lender". It came from "Original Servicer". It states that "Original Lender" was the warehouse lender and that the money was funded from them.

82. The Securities and Exchange Commission filings publically submitted by "SPONSOR/SELLER", did not reveal a warehouse line from "ORIGINAL LENDER". "ORIGINAL LENDER since has been closed and is now formally being investigated by the Department of Justice.

83. Plaintiff's copy of this note after it was endorsed in blank without recourse. It would appear to be a nullity and separates the note from any recordable interest. (ex-4)

84. The deceit above may be summarized for easy access of each of the parties:

a) "ORIGINAL LENDER" information including deceit outlined in Cause of Action #1. "ORIGINAL LENDER" apparently failed to lend any of their own money for Plaintiff's loan despite indicating it had done so both contractually and verbally. Plaintiff relied on this information, acted on this information, "ORIGINAL LENDER" intended Plaintiff to act on such information while knowing this information was not true, and Plaintiff so acted to his detriment. "ORIGINAL LENDER" was fully aware of such self dealings and deceptions. This may have may issues with excessive and undisclosed "Yield Spread Premiums"

b) "ORIGINAL TRUSTEE" as Trustee with such duties was patently false on its surface as it was the lender and has responded to suit as such. This Trustee has a contractual conflict of interest because the "ORIGINAL LENDER" was put forth to mislead and allow the events to take place in a closed closely controlled transaction without representation of Plaintiff's interests, while knowing that the information was not true and that Plaintiff relied on such honesty and presentation to act, and was induced with "ORIGINAL SERVICER" to act and that Plaintiff did to his detriments. This duel action of lender and trustee is a conflict unroofed due to the extra ordinary efforts to detail the mortgage proffering business. This "Special Relationship" goes from Insurance, Escrow, and Mortgage Broker (friends), and is incestuous, omnipresent, and indistinct able.

c) "FORECLOSING TRUSTEE", acting through instructions from "PSA SERVICER", and not a signed agent of the beneficiary and not with an agency agreement to perform for that Beneficiary. "FORECLOSING TRUSTEE' acted without regards to the truth, and not in compliance with requests. Distortion of truths done knowing the actual truth, with the intent for others to act including Plaintiff, Courts and other consumers, to the detriment of the same. They are involved in thousands of

foreclosures the full extent is just now starting to surface. "FORECLOSING TRUSTEE" did not have an agency agreement with "PSA TRUSTEE" the alleged Beneficiary. "PSA SERVICER" has the agreement with "SERVICER", the Master Servicer. Filing documents known to be false as "PSA TRUSTEE" agent of the beneficiary is incorrect and further misleading. Plaintiff has sworn testimony in court depositions which allows further light to shine on these activities.

d) "SERVICER" as outlined above has acted without regards to the statutory FDCPA duties of the newly acquired Master Servicer, including notifying Plaintiff of any change in ownership or what amount was due on his account. "SERVICER" had the duty to respond to the Beneficiary Statement request governed by Section §2943 of the Nevada Code. It did not. All done while knowing the truth. All done contrary to the statutory requirements set forth, with the intent for Plaintiff and others to act, and while knowing what they were doing was not truthful. The Plaintiff relied on this to his detriments, and has been damaged. Plaintiff diligence and documents will support these claims, and that of expert witnesses.

e) "MERS" has a duty as part of the agreements set for in the "MERS" contracts with member banks and as nominee of the beneficiary and note holder. The requirements are set forth in their rules 6, 7, 8. "MERS" knows that its rules are not followed especially rule 8, Foreclosures. "MERS" did not own or could not own an interest in Plaintiff property as set forth with the Notice of Default in "MERS" name. "MERS" knew this and they have acted to create an opaque window into the "Securitization" and selling of home loans. Members are to follow rules. "MERS" has purposely allowed this to occur while knowing all the time the damages that would result. Plaintiff has been damaged by such reckless behaviors and the surface is now being scrapped. The governmental Agency Fannie Mae will not allow MERS to be named in any Foreclosure proceedings as announced in their March 30, 2010 SVC-2010-5 publication.

f) "PSA TRUSTEE" has a duty as Trustee of an SEC filed Securitization Trust to follow the Pooling and Servicing Agreements and also to follow NY Trusts, SEC Security Laws and IRS tax laws. "PSA TRUSTEE" as alleged assigned Beneficiary took in assignment of this defaulted loan had a direct assigned contractual duty to Plaintiff. A loan in default is not allowed to be added to a tax free trust by the NY Trust Laws. "PSA TRUSTEE" knew this was the fact. "PSA TRUSTEE" did these acts

knowing that they were not allowed. "PSA TRUSTEE" did this while creating a paper trail that Plaintiff and others would rely on to their detriments. "PSA TRUSTEE" knew the damages that this would cause. "PSA TRUSTEE" further knew that Plaintiff's loan was paid by either cross collateralization, insurance, swaps, or other mechanisms. PSA TRUSTEE is trying to collect on the same loan multiple times."

85. Plaintiff had no indication that he should not rely on the fraudulent and deceitful misrepresentation and for that he has suffered the resulting damages of loss of personal savings, costs of the representation, credit damages, and opportunity costs resulting in the full time focus of his representation, and other damages determined at trial. This maybe subject to punitive, consequential, emotional distress, and recession.

## THIRD CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

86. Plaintiffs re-allege and incorporated by reference all preceding paragraphs as though fully set forth herein.

87. The actions of Defendants, as set forth herein, have resulted in the Plaintiffs being threatened with the loss of the Property.

88. This outcome has been created without any right or privilege on the part of the Defendants, and, as such, their actions constitute outrageous or reckless conduct on the part of Defendants.

89. Defendants intentionally, knowingly and recklessly misrepresented to the Plaintiffs those Defendants were entitled to exercise the power of sale provision contained in the Deed of Trust. In fact, Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the Property.

90. Defendants' conduct – fraudulently attempting to foreclose on a property in which they

have no right, title, or interest – is so outrageous and extreme that it exceeds all bounds which is usually tolerated in a civilized community.

91. Such conduct was undertaken with the specific intent of inflicting emotional distress on the Plaintiffs, such that Plaintiffs would be so emotionally distressed and debilitated that he/she would be unable to exercise legal rights in the Property; the right to title of the Property, the right to cure the alleged default, right to verify the alleged debt that Defendants are attempting to collect, and right to clear title to the Property such that said title will regain its marketability and value.

92. At the time Defendants began their fraudulent foreclosure proceedings, Defendants were not acting in good faith while attempting to collect on the subject debt.  Defendants, and each of them, committed the acts set forth above with complete; utter and reckless disregard of the probability of causing Homeowners to suffer severe emotional distress.

93. As an actual and proximate cause of Defendants attempt to fraudulently foreclose on Plaintiff's home, the Plaintiffs have suffered severe emotional distress, including but not limited to lack of sleep, anxiety, and depression.

94. Plaintiffs did not default in the manner state in the Notice of Default, yet because Defendants' outrageous conduct, Plaintiffs have been living under the constant emotional nightmare of losing the Property.

95. As a proximate cause of Defendant's conduct, Plaintiffs have experienced many sleepless nights, severe depression, lack of appetite, and loss of productivity at its place of employment.

96. The conduct of Defendants, and each of them, as herein described, was so vile, base, contemptible, miserable, wretched, and loathsome that it would be looked down upon and despise by ordinary people.  Plaintiffs are therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter other from engaging in similar conduct

## FOURTH CAUSE OF ACTION

### SLANDER OF TITLE

### (Against All Defendants and Does 45-60)

97. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

98. Plaintiffs incorporate here each and every allegation set forth above.  Defendants, and each of them, disparaged Plaintiffs' exclusive valid title by and through the preparing, posting, publishing, and recording of the documents previously described herein, including, but not limited to, the RECORDED DOCUMENTS.

99. Said Defendants knew or should have known that such documents were improper in that at the time of the execution and delivery of said documents, Defendants had no right, title, or interest in the Property.  These documents were naturally and commonly to be interpreted as denying, disparaging, and casting doubt upon Plaintiffs' legal title to the Property.  By posting, publishing, and recording said documents, Defendants' disparagement of Plaintiffs' legal title was made to the world at large.

100.   As a direct and proximate result of Defendants' conduct in publishing these documents, Plaintiffs' title to the Property ahs been disparaged and slandered, and there is a cloud on Plaintiffs' title, and Plaintiff has suffered, and continues to suffer, damages in an amount to be proved at trial.

101.   As a further proximate result of Defendant's conduct, Plaintiffs have incurred expenses in order to clear title to the Property.  Moreover, these expenses are continuing, and Plaintiffs will incur additional charges for such purpose until the cloud on Plaintiffs' title to the property has been removed.  The amounts of future expenses and damages are not ascertainable at

this time.

102.   As a further direct and proximate result of Defendants' conduct, Plaintiffs have suffered humiliation, mental anguish, anxiety, depression and emotional and physical distress, resulting in the loss of sleep and other injuries to his and her health and well-being, and continue to suffer such injuries on an ongoing basis.  The amount of such damages shall be prove at trial.

103.   At the time that the false and disparaging documents were created and published by the Defendants, Defendants knew the documents were false and created and published them with the malicious intent to injure Plaintiffs and deprive them of their exclusive right, title and interest in the Property, and to obtain the Property for their own use by unlawful means.

104.   The conduct of the Defendants in publishing the documents described above was fraudulent, oppressive, and malicious.  Therefore, Plaintiffs are entitle to an award of punitive damages in an amount sufficient to punish Defendants for their malicious conduct and deter such misconduct in the future.

### FIFTH CAUSE OF ACTION
### DECLARATORY RELIEF

#### (Against All Defendants)

105.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.   An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their rights and duties regarding the Note and Trust Deed.

107.   Plaintiffs contend that pursuant to the Loans, Defendants do not have authority to foreclose upon and sell the Property.

108.   Plaintiffs are informed and believed and upon that basis alleges that Defendants dispute Plaintiffs contention and instead contend they may properly foreclose upon the Property.

109.   Plaintiffs thereof request a judicial determination of the rights, obligations and interest of the parties with regard to the Property, and such determination is necessary and appropriate at this time under the circumstances so that all parties may ascertain and know their rights, obligations and interests with regard to the Property.

110.   Plaintiffs request a determination of the validity of the Trust Deeds as of the date the Notes were assigned without a concurrent assignation of the underlying Trust Deeds.

111.   Plaintiffs request a determination of the validity of the NOD.

112.   Plaintiffs request a determination of whether any Defendant has authority to foreclose on the Property.

## SIXTH CAUSE OF ACTION

### VIOLATION OF NEVADA CIVIL CODE SECTION 2932.5

#### (Against all Defendants)

113.   Plaintiffs re-allege and incorporate by reference all preceding paragraph as though fully set forth herein.

114.   Nevada Civil Code § 2932.5 provides.

> Where a power to sell real property is given to a mortgagee, or other encumbrances, in an instrument intended to secure the payment of money, the power is part of the Security and vests in any person who by assignment becomes entitled to payment of the money secured by the instruments. The power of sale may be exercised by the assigned if the assignment us duly acknowledged and recorded.

115.   Plaintiffs are informed and believe, and thereon allege that § 2932.5 require the recordation of an assignment of the beneficial interest in a deed of trust prior to foreclosure. Defendants, and each of them, cannot show valid and recorded assignments.

116.   As a proximate result of Defendant's action, Plaintiffs have been damaged in an amount not yet ascertained, to be proven at trial.

117.   WHEREFORE, Plaintiffs prays for relied as set forth below.

## SEVENTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES IN VIOLATION OF NEVADA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ
### (Against All Defendants and Does 80-100)

118.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth therein.

### RECENT DEVELOPMENTS AND DOCUMENT FRAUD

119.   On September 24, 2010, NEVADA Attorney General, Edmund G. Brown, Jr. (aka Jerry Brown) ("AG"), directed ALLY Financial, Inc., which owns GMAC, Mortgage LLC, to stop foreclosures in Nevada until it proves it is complying with State law.

120.   On October 1, 2010, the AG similarly requested that a J.P. Morgan Chase stop foreclosure in Nevada until it proves it is complying with State law.

121.   Since then, Bank of America has halted foreclosures in 23 judicial foreclosure States.

122.   On or about October 11, 2010, BAC announced that it is temporarily halting foreclosures nationwide.

123.   The impetus of these necessary but drastic measures stems from allegations of document fraud on the part of the banks and their servicers. This epidemic is not limited to the banks listed above, but is an industry wide problem.

124.   During the securitization era, Banks and the resulting trusts, in the rust to securitized mortgages and sell those to investors routinely ignored the critical step of obtaining mortgage assignments from the original lenders to the securities companies to the trusts.

125.   Now, years later, when the companies "servicing" the trusts need to foreclose, there

are no documents available to documents the proper chain of title because none were originally created. As a result, banks are creating the missing documents or outsourcing the documents to companies like Lender Processing Services to produce the needed assignments. This practice was admitted by deposed bank executives such as GMAC's Jeffrey Stephen who admitted in sworn deposition testimony to signing more than 500 documents a day and up to 10, 000 documents a month related to foreclosures without reviewing them.

126.   Due to the strict timelines and guidelines to complete a foreclosure, banks are also fabricating other documents to comply with Nevada's foreclosure guidelines.

127.   The impact of these allegations is so cogent that Old Republic National Title Company will no longer insure the title on homes foreclosed by J.P. Morgan Chase or GMAC, Mortgage LLC.

128.   As further proof of the unlawful business practices, other state legislatures have taken steps to make the process more transparent (see Arizona State Senate Bill 1259, requiring non-originating foreclosure lenders to produce full chain of title to verify ownership). http://www.azleg.gov/DocuemtnsForBill.asp? Bill_Number=SB1259&Session_ID=102

129.   Other states have taken the lead to void foreclosure sales by parties who lack standing to foreclose. *See, e.g., U.S. Bank Nat. Ass'n v. Ibanez* (2011) 941 N.E.2d 40. Most recently, an Alabama Circuit recognized the legal ramifications regarding the failure of banks and their trustees to properly transfer Notes and Deeds of Trusts. In *Phyllis Horace v. La Salle Bank National Association, Et Al,* 57-cv-2008-00362.00, the Alabama Circuit Court not only sided with the homeowner on this exact issue; the court issued an order **permanently enjoining** the defendant trust, LaSalle Bank National Association, from foreclosing on the plaintiff's house because LaSalle failed under New York law and its own Pooling and Servicing Agreement to properly transfer the plaintiff's mortgage note on the plaintiff's home.

130.    In permanently forestalling any foreclosure on the home by defendant, the court did not mince words: "First, the Court is surprised to the point of astonishment that the defendant (LaSalle Bank National Association) did not comply with the terms of its own Pooling and Servicing Agreement and further did not comply with New York Law in attempting to obtain assignment of Plaintiff Horace's notes and mortgage. Second, plaintiff Horace is a third party beneficiary of the Pooling and Servicing Agreement created by the defendant trust (LaSalle Bank National Association). Indeed without such Pooling and Servicing Agreements, Plaintiffs Horace and other mortgagors similarly situated would never have been able to obtain financing."

131.    Plaintiffs are informed and believe, and therefore allege, that Defendants, and each of them, engaged in unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising in violation, rising to unfair and deceptive business practices, in violation of Nevada Business and Professions Code § 17200 and the Unfair and Deceptive Acts and Practices statutes.

132.    The above specified Defendant, and each of them, as part of their business practices, fraudulently and knowingly procured or offered false or fraudulently prepared documents to fabricate the missing gaps in the chain of title or to falsely demonstrate compliance with the PSA, state law and Regulations related to non-judicial foreclosure and allowed these documents to be filed, registered, or recorded within this jurisdiction. The members of the public are likely to be deceived by this unlawful, oppressive and fraudulent business practices.

133.    Plaintiffs are informed and believe, and thereon allege that Defendant lacked authority to execute an assignment of the Deed of Trust from the original beneficiary to Defendant.

134.    Plaintiffs are informed and believe, and thereon allege that Defendant at all relevant times had knowledge that no such authority was ever bestowed upon it by the original lender, yet Defendant still caused to be recorded the false documents with the county recorder. Further, the

assignment recorded is signed by an individual purporting to be the "Assistant Secretary" of MERS. Plaintiffs believe and thereupon allege that this individual did not have the authority or capacity to sign on behalf on MERS to cause such substitutions or assignments. As such, Plaintiffs are informed and believe, and thereon allege that certain misrepresentations, including sworn statements. Were made to the public to cause the notary public to perform an improper notary act on a document.

135.    The business practices of the above specified Defendants, and each of them, were unlawful, deceptive, misleading and fraudulent and violate Nevada law as alleged herein above. Further, the above specified Defendants, and each of them, knew that their business practices were unlawful, deceptive, misleading and fraudulent at the time they were so engaged.

136.    Pursuant to Sections 17200 et seq. of the Nevada *Business and Professions Code*, unfair business practices include any unlawful, unfair, misleading or fraudulent business practice. The fraudulent and unlawful conduct of the above specified Defendants, and each of them, as alleged herein, constituted unlawful, unfair and/or fraudulent business practices within the provision of §§ 17200 et seq of the Nevada *Business and Professions Code.*

137.    As a direct and proximate result of the unfair business practices of the above specified Defendants, and each of them, as herein alleged, Plaintiffs have incurred damages in that Plaintiffs' Home is now subject to foreclosure at the hands of the above specified Defendants, and each of them, all by reason of which Plaintiffs have been damaged in at least the sum of the jurisdictional amount of this Court, plus interest, attorney's fees and costs, and additional amounts, according to proof at the time of trial.

138.    As a further direct and proximate result if the unfair business practices of the above specified Defendants, and each of them, Plaintiffs are entitle to an order or preliminary injunction prohibiting said Defendants, and each of them, from selling or attempting to sell, or causing to be

sold, any interest whatsoever in the Home.

## EIGHTH CAUSE OF ACTION

### Violation of Section § 726 of the Nevada Code of Civil Procedure

### "PSA TRUSTEE"

144.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth therein.

145.    These provisions are "to prevent multiplicity of actions, to compel exhaustion of all security and to require the debtor to be credited with the fair market value of the secured property. It may well be interpreted as to an entity collection twice or more for the same debt.  This may cause the security interest to be cancelled.

146.    "DEUTSCHE" is not a registered trust in Nevada to do business, and has received over $8.5 billion payments from AIG's **default**, HAMP program, and has been paid untold amounts from any default that occurs, it is paid by counter parties, and mortgage insurance reimbursements of untold amounts.

147.    Plaintiff alleges that "DEUTSCHE" has already been paid for the value of the security interest Plaintiff's property, which furthers the need for accurate accounting including previous payoff that would have cover such debt.

148.    "DEUTSCHE" is requested by discovery to present an accurate detail of the accountings.  Including appropriately timed sales and assignments and payoffs, and if defendant has received such credits first, then the security interest in Plaintiff's property would be lost. "DEUTSCHE" takes advantage of the insurances and credit enhancements inside of the trust (such as excess interest reserves, over collateralization reserves, NIMS or other insurance policies which were written by AIG), which cover losses on the mortgage loans.

Plaintiff request that the security interest in this property be removed based on Section § 726 of Nevada Code of Civil Procedure as this interest has been paid.

### NINTH CAUSE OF ACTION
### CIVIL RICO

### COUNT ONE
Acquisition and Maintenance of an Interest in and Control of
an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(b)

149.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

150.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

151.   During the ten (10) calendar years preceding  August 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

152.   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

153.   Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

154.   *Respondeat superior* (principal is liable for agents' misconduct:  knowledge of, participation in, and benefit from a RICO enterprise).

**COUNT TWO:**
Conduct and Participation in a RICO *Enterprise*
through a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(c)

155.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

156.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

157.   Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

158.   During the ten (10) calendar years preceding July 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

159.   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

160.   Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

**COUNT THREE:**
Conspiracy to Engage in a
*Pattern of Racketeering Activity*:

18 U.S.C. §§ 1961(5), 1962(d)

161.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

162.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

163.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).  See also 18 U.S.C. §§ 1961(4), (5) and (9).

164.   During the ten (10) calendar years preceding July 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

165.   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

166.   Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

167. USC 891-984 Extortionate credit transactions; 1341 mail fraud, 1343 wire fraud, 1344 financial institution fraud, 1503 obstruction of justice, 1952 racketeering, 1956 laundering of monetary instruments, 1957 monetary transaction derived from specified unlawful activity, and 29 USC 186 501c – fraud connected with a case under title 11, fraud in the sale of securities.

Please take notice that Plaintiff demands trial by jury in this action

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs will ask for the following for each Cause of Action to be awarded:

## **FIRST THROUGH NINTH CAUSE OF ACTION**

1. For Compensatory Damages in an amount to be determined by proof at trial;

2. For Special Damages in an amount to be determined by proof at trial;

3. For General Damages in an amount to be determined by proof at trial;

4. For Punitive Damages as allowed by law;

5. For Restitution as allowed by law;

6. For Attorney's Fees and Costs of this action;

7. For Declaratory Relief, including but not limited to the following Decrees of this Court that:

    a.  Plaintiffs are the prevailing party;

    b.  The Trustees of the Trusts have no enforceable secured or unsecured claim against the Property;

    c.  The Sponsor has no enforceable secured or unsecured claim against the Property;

    d.  The Depositor has no enforceable secured or unsecured claim against the Property;

**I DECLARE UNDER PENALTY OF PERJURY THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

DATED this _____ day of _____, 20____.

_____
JAIME  BARAWID, In Pro Se

Please take notice that Plaintiff demands trial by jury in this action

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs will ask for the following for each Cause of Action to be awarded:

## FIRST THROUGH NINTH CAUSE OF ACTION

1. For Compensatory Damages in an amount to be determined by proof at trial;

2. For Special Damages in an amount to be determined by proof at trial;

3. For General Damages in an amount to be determined by proof at trial;

4. For Punitive Damages as allowed by law;

5. For Restitution as allowed by law;

6. For Attorney's Fees and Costs of this action;

7. For Declaratory Relief, including but not limited to the following Decrees of this Court that:

    a. Plaintiffs are the prevailing party;

    b. The Trustees of the Trusts have no enforceable secured or unsecured claim against the Property;

    c. The Sponsor has no enforceable secured or unsecured claim against the Property;

    d. The Depositor has no enforceable secured or unsecured claim against the Property;

**I DECLARE UNDER PENALTY OF PERJURY THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

DATED this _19_ day of _APRIL_ , 20_12_

ATTY IN FACT FOR JAIME BARAWID

_MICHAEL L. BARAWID_
JAIME BARAWID, In Pro Se

35
COMPLAINT

I DECLARE UNDER PENALTY OF PERJURY THE FOREGOING IS TRUE AND

CORRECT TO THE BEST OF MY KNOWLEDGE.

DATED this ___ day of _____ 20__.

FLOR DE LYS BARAWID, In Pro Se

36
COMPLAINT

# "SUB-EXHIBITS TO A"

Exhibit A-1.  DEED OF TRUST
Exhibit A-2.  NOTICE OF DEFAULT
Exhibit A-3.  ASSIGNMENT OF DEED OF TRUST
Exhibit A-4.  NOTICE OF TRUSTEE'S SALE
Exhibit A-5.  TRUSTEE'S DEED UPON SALE

*"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"*

# Exhibit A-1.  DEED OF TRUST

"LOAN-AUDITOR.ORG, *SAR-NJ-ADT-ALT*"

20071130-0004854

Fee: $38.00
N/C Fee: $25.00

11/30/2007          17:01:00
T20070208734
Requestor:
FIDELITY NATIONAL TITLE

Debbie Conway          MGM
Clark County Recorder    Pgs: 25

Assessor's Parcel Number:
177-32-311-018
After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
BONNIE B. BURNETT
Recording Requested By:
M. WIMER

Countrywide Bank, FSB.

2595 W CHANDLER BLVD
CHANDLER
AZ 85224

———————————————— [Space Above This Line For Recording Data] ————————————————

00018182331611007
[Doc ID #]

I hereby affirm that this document submitted for recording does not contain a Social Security Number.
Signature _Cyndee Graybal_ Title _TITLE OFFICER_

# DEED OF TRUST

MIN 1001337-0002526963-3

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

M Deed of Trust-NV
1006A-NV (06/07)(d/i)          Page 1 of 15          Form 3029 1/01



DOC ID #: 00018182331611007

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   NOVEMBER 26, 2007                ,
together with all Riders to this document.

(B) "Borrower" is

JAIME M BARAWID, A/ M̶A̶R̶R̶I̶E̶D̶ /M̶A̶N̶ /A̶S̶ /H̶I̶S̶ /S̶O̶L̶E̶ /&̶ /S̶E̶P̶A̶R̶A̶T̶E̶ /P̶R̶O̶P̶E̶R̶T̶Y̶

AN UNMARRIED MAN

Borrower is the trustor under this Security Instrument.

(C) "Lender" is
Countrywide Bank, FSB.

Lender is a
FED SVGS BANK

organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500
Alexandria, VA 22314
(D) "Trustee" is
TRUSTEE

25555 N TRUSTEE
SEATTLE, CA 21354-8954

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   NOVEMBER 26, 2007            .
The Note states that Borrower owes Lender
ONE HUNDRED EIGHTY TWO THOUSAND and 00/100

Dollars (U.S. $ 182,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   DECEMBER 01, 2037            .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

M Deed of Trust-NV
1006A-NV (06/07)                         Page 2 of 15                         Form 3029 1/01

DOC ID #: 00018182331611007

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY                                                                          of
                        [Type of Recording Jurisdiction]

CLARK                                                                          :
                        [Name of Recording Jurisdiction]

DOC ID #: 00018182331611007
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

11037 MEZZANA ST, LAS VEGAS

[Street/City]

Nevada   89141-3405   ("Property Address"):
           [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the
"Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for
Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,
but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender
including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the
right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of
record. Borrower warrants and will defend generally the title to the Property against all claims and demands,
subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform
covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real
property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any

M Deed of Trust-NV
1006A-NV (06/07)                     Page 4 of 15                     Form 3029  1/01

DOC ID #: 00018182331611007

prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may

M Deed of Trust-NV
1006A-NV (06/07)                              **Page 5 of 15**                                    Form 3029 1/01

DOC ID #: 0001818233161007

require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender

DOC ID #: 0001818233161100?

requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

M Deed of Trust-NV
1006A-NV (06/07)                      Page 7 of 15                      Form 3029  1/01

DOC ID #: 0001818233161007

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to:  (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage

M Deed of Trust-NV
1006A-NV (06/07)                            **Page 8 of 15**                            Form 3029 1/01

DOC ID #: 00018182331611007

substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

M Deed of Trust-NV
1006A-NV (06/07)                          Page 9 of 15                          Form 3029  1/01

DOC ID #: 0001818231611007

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  **Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"):  (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's

DOC ID #: 00018182331611007

rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,

DOC ID #: 0001818233161007

Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;

M Deed of Trust-NV
1006A-NV (06/07)                                      Page 12 of 15                                      Form 3029  1/01

DOC ID #: 00018182331611007

(b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees;

DOC ID #: 00018182331611007

**(b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $   300.00      .

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JAIME M. BARAWID                                        -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

_____ (Seal)
                                                       -Borrower

DOC ID #: 00018182331611007

**STATE OF NEVADA**
**COUNTY OF**

This instrument was acknowledged before me on _____ by

_____

_____

_____

_____

_____

(SEE ATTACHED ACKNOWLEDGMENT)

11-27-07
phu

Mail Tax Statements To:
TAX DEPARTMENT SV3-24

450 American Street
Simi Valley CA, 93065

**M Deed of Trust-NV**
**1006A-NV (06/07)**                    **Page 15 of 15**                    Form 3029  1/01

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of **SAN DIEGO**                    } ss.

On **NOVEMBER 27, 2007** before me, **ALICE M COOPER, NOTARY PUBL**
Date                                    Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared   **JAIME M. BARAWID**
Name(s) of Signer(s)

☐ personally known to me

☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

**ALICE M. COOPER**
COMM. #1627755
NOTARY PUBLIC • CALIFORNIA
SAN DIEGO COUNTY
Commission Expires Jan. 3, 2010

WITNESS my hand and official seal.

_Alice M Cooper_
Signature of Notary Public

*Place Notary Seal Above*

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: **DEED OF TRUST**

Document Date: **11-26-07**          Number of Pages: **15**

Signer(s) Other Than Named Above: **NONE**

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): ____ | ☐ Corporate Officer — Title(s): ____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Title No.  FT01-FT070012729

## LEGAL DESCRIPTION

### EXHIBIT "A"

Assessor's Parcel No:  177-32-311-018

LOT TWO HUNDRED FIFTY-SEVEN (257) IN BLOCK "E" OF BELLA TERRA UNIT NO. 1 AT
SOUTHERN HIGHLANDS AS SHOWN BY MAP THEREOF ON FILE IN BOOK 96 OF PLATS, PAGE 8
IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

CLTA Preliminary Report Form - Modified (11/7/06)

FDNV0302.rdw

DOC ID #: 00018182331611007

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this TWENTY-SIXTH       day of
NOVEMBER, 2007   , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the
undersigned (the "Borrower") to secure Borrower's Note to
Countrywide Bank, FSB.


(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:

11037 MEZZANA ST
LAS VEGAS, NV 89141-3405

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with
other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY


(the "Declaration"). The Property is a part of a planned unit development known as
CONDO

[Name of Planned Unit Development]


**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
VMP -7R (0411)       CHL (12/05)(d)       Page 1 of 3
VMP Mortgage Solutions, Inc.                              **Form 3150  1/01**

* 2 3 9 9 1 *

* 1 8 1 8 2 3 3 1 6 0 0 0 0 0 1 0 0 7 R *

DOC ID #: 00018182331611007

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

DOC ID #: 00018182331611007

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
JAIME M. BARAWID                                                        - Borrower

_____ (Seal)
                                                                                  - Borrower

_____ (Seal)
                                                                                  - Borrower

_____ (Seal)
                                                                                  - Borrower

-7R (0411)          CHL (12/05)              Page 3 of 3                    Form 3150  1/01

# 1-4 FAMILY RIDER
### (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
PARCEL ID #:
177-32-311-018

Prepared By:
BONNIE B. BURNETT

0001818233161007
[Doc ID #]

**MULTISTATE 1 - 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Page 1 of 5

 -57R (0411)     CHL (11/04)(d)
VMP Mortgage Solutions, Inc. (800)521-7291

Initials:_____
**Form 3170 1/01**

*23991*

*18182331600000001057R*

DOC ID #: 00018182331611007

THIS   1-4   FAMILY   RIDER   is   made   this TWENTY-SIXTH       day   of
NOVEMBER, 2007   , and is  incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given
by the undersigned (the "Borrower") to secure Borrower's Note to
Countrywide Bank, FSB.

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:
                11037 MEZZANA ST, LAS VEGAS, NV 89141-3405

                          [Property Address]

   **1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

   **A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to
the Property to the extent they are fixtures are added to the Property description, and shall also
constitute the Property covered by the Security Instrument: building materials, appliances and
goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used
in connection with the Property, including, but not limited to, those for the purposes of supplying or
distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing
apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water
closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings,
storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors,
cabinets, paneling and attached floor coverings, all of which, including replacements and additions
thereto, shall be deemed to be and remain a part of the Property covered by the Security
Instrument. All of the foregoing together with the Property described in the Security Instrument (or
the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family
Rider and the Security Instrument as the "Property."

   **B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has agreed in
writing to the change. Borrower shall comply with all laws, ordinances, regulations and
requirements of any governmental body applicable to the Property.

   **C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any
lien inferior to the Security Instrument to be perfected against the Property without Lender's prior
written permission.

   **D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition
to the other hazards for which insurance is required by Section 5.

                                                          Initials: _____

-57R (0411)          CHL (11/04)          Page 2 of 5                    Form 3170 1/01

DOC ID #: 00018182331611007

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Initials:_____

DOC ID #: 00018182331611007

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Initials:_____

-57R (0411)    CHL (11/04)          Page 4 of 5                      Form 3170 1/01

DOC ID #: 00018182331611007

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____(Seal)
JAIME M. BARAWID                                                            - Borrower

_____(Seal)
                                                                                     - Borrower

_____(Seal)
                                                                                     - Borrower

_____(Seal)
                                                                                     - Borrower

-57R (0411)   CHL (11/04)          Page 5 of 5                    Form 3170 1/01

# Exhibit A-2. NOTICE OF DEFAULT

Inst#: 200908130004212
Fees: $65.00
N/C Fee: $0.00
08/13/2009 02:51:19 PM
Receipt #: 14317
Requestor:
FIDELITY NATIONAL DEFAULT SOL
Recorded By: SOL  Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

RECORDING REQUESTED BY:
WHEN RECORDED MAIL TO:
RECONTRUST COMPANY
2380 Performance Dr, TX2-985-07-03
Richardson, TX  75082
Attn:
TS No. 09-0095435
Title Order No. 090473897

APN No. 177-32-311-018

## NEVADA IMPORTANT NOTICE
### NOTICE OF DEFAULT/ELECTION TO SELL UNDER DEED OF TRUST

NOTICE IS HEREBY GIVEN THAT: RECONTRUST COMPANY, N.A., is the duly
appointed Trustee under a Deed of Trust dated 11/26/2007, executed by JAIME M BARAWID,
AN UNMARRIED MAN as Trustor, to secure certain obligations in favor of MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. as beneficiary recorded 11/30/2007, as
Instrument No. 0004854 (or Book 20071130, Page ) of Official Records in the Office of the
County Recorder of Clark County, Nevada.   Said obligation including ONE NOTE FOR THE
ORIGINAL sum of $182,000.00.  That a breach of, and default in, the obligations for which
such Deed of Trust is security has occurred in that payment has not been made of :
FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL, INTEREST AND IMPOUNDS
WHICH BECAME DUE ON  04/01/2009  AND ALL SUBSEQUENT INSTALLMENTS OF
PRINCIPAL, INTEREST AND IMPOUNDS, TOGETHER WITH ALL LATE CHARGES,
PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY,
INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEYS' FEES.  IN
ADDITION, THE ENTIRE PRINCIPAL AMOUNT WILL BECOME DUE ON  12/01/2037
AS A RESULT OF THE MATURITY OF THE OBLIGATION ON THAT DATE.

That by reason thereof, the present beneficiary under such deed of trust has deposited with
RECONTRUST COMPANY, N.A. such deed of trust and all documents evidencing obligations
secured thereby, and has declared and does hereby declare all sums secured thereby
immediately due and payable  and has elected and does hereby elect to cause the trust property
to be sold to satisfy the obligations secured thereby.

### NOTICE

You may have the right to cure the default hereon and reinstate the one obligation secured by
such Deed Of Trust above described.  Section NRS 107.080 permits certain defaults to be cured
upon the payment of the amounts required by that statutory section without requiring payment of
that portion of principal and interest which would not be due had no default occured.  Where
reinstatement is possible, if the default is not cured within 35 days following recording and
mailing of this Notice to Trustor or Trustor's successor in interest, the right of reinstatement will
terminate and the property may there after be sold.  The Trustor may have the right to bring
court action to assert the non existence of a default or any other defense of Trustor to
acceleration and sale.

Instrument # 200908130004212 Page: 2 End of Document

To determine if reinstatement is possible and the amount, if any, to cure the default, contact:
BAC Home Loans Servicing, LP, c/o RECONTRUST COMPANY, 2380 Performance
Dr.,TX2-985-07-03, Richardson, TX 75082, PHONE: (800) 281-8219. Should you wish to
discuss possible options for loan modification, you may contact the Home Retention Division at
1-800-669-6650. If you meet the requirements of Section NRS 107.085, you may request
mediation in accordance with the enclosed Election/Waiver of Mediation Form and instructions.
You may also contact the Nevada Fair Housing Center at 1-702-731-6095 or the Legal Aid
Center at 1-702-386-1070 for assistance.

RECONTRUST COMPANY, as agent for the Beneficiary
By: Fidelity National Default Solutions, as Agent

By: LSI Title Agency, Inc., an Illinois Corporation, as Agent
　　　Anselmo Pagkaliwangan

State of: California
County of: Orange

On ___8/13/09___, before me, _____David Mathias_____, Notary
Public, personally appeared Anselmo Pagkaliwangan, who proved to me on the basis of satisfactory
evidence to be the person whose name is subscribed to the within instrument and acknowledged to me
that he executed the same in his authorized capacity and that by his signature on the instrument the
person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
　　　　　　　　David Mathias

DAVID MATHIAS
Commission # 1769151
Notary Public - California
Orange County
My Comm. Expires Sep 18, 2011

# Exhibit A-3. ASSIGNMENT OF DEED OF TRUST

*"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"*

RECORDING REQUESTED BY:
RECONTRUST COMPANY, N.A.
**AND WHEN RECORDED MAIL DOCUMENT TO:**
BAC Home Loans Servicing, LP
400 COUNTRYWIDE WAY SV-35
SIMI VALLEY, CA  93065

177 32 31L 018

TS No. 09-0095435
TITLE ORDER#: 090473897

---

### CORPORATION ASSIGNMENT OF DEED OF TRUST NEVADA

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING LP**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 11/26/2007,
EXECUTED BY: JAIME M BARAWID, AN UNMARRIED MAN, TRUSTOR: TO TRUSTEE,
TRUSTEE AND RECORDED AS INSTRUMENT NO. 0004854 ON 11/30/2007, IN BOOK 20071130,
OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF CLARK  COUNTY, IN THE
STATE OF NEVADA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST.

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE
MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS
ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED: August 15, 2009                MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
                                      INC.

State of: _____ **Texas** _____ )
County of: _____ **Dallas** _____ ) BY: _Angela Nava_____

                   Angela Nava        Assistant Secretary

On _8/19/09_ before me   Christopher A. Williams _____, personally appeared
know to me (or proved to me on the oath of _____ or through _____) to be the
person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she
executed the same for the purposes and consideration therein expressed.
Witness my hand and official seal.

_____
Notary Public's Signature

CHRISTOPHER A. WILLIAMS
My Commission Expires
June 20, 2012

# Exhibit A-4. NOTICE OF TRUSTEE'S SALE

"LOAN-AUDITOR.ORG, *SAR-NJ-ADT-ALT*"

Inst #: 201003250003479
Fees: $15.00
N/C Fee: $0.00
03/25/2010 02:28:49 PM
Receipt #: 286637
Requestor:
FIDELITY NATIONAL DEFAULT S
Recorded By: DXI   Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

**WHEN RECORDED MAIL TO:**
RECONTRUST COMPANY
2380 Performance Dr, TX2-985-07-03
Richardson, TX 75082

TS No. 09-0095435
Title Order No. 090473897

APN No.:177-32-311-018

## NEVADA NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 11/26/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

Notice is hereby given that RECONTRUST COMPANY, N.A., as duly appointed trustee pursuant to the Deed of Trust executed by JAIME M BARAWID, AN UNMARRIED MAN, dated 11/26/2007 and recorded 11/30/2007, as Instrument No. 0004854, in Book 20071130, Page , of Official Records in the office of the County Recorder of CLARK COUNTY, State of Nevada, will sell on 04/13/2010 at 10:00 AM, at At the front entrance to Nevada Legal News located at 930 S. 4TH Street, Las Vegas, NV 89101 at public auction, to the highest bidder for cash(in the forms which are lawful tender in the United States, payable in full at time of sale), all right, title, and interest conveyed to and now held by it under said Deed of Trust, in the property situated in said County and State and as more fully described in the above referenced Deed of Trust. The street address and other common designation, if any, of the real property described above is purported to be: 11037 MEZZANA ST, LAS VEGAS, NV 89141-3405. The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

The total amount of the unpaid balance with interest thereon of the obligation secured by the property to be sold plus reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $199,452.90. It is possible that at the time of sale the opening bid may be less than the total indebtedness due.

In addition to cash, the Trustee will accept cashier's checks drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed until funds become available to the payee or endorsee as a matter or right. Said sale will be made, in an "AS IS" condition, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to satisfy the indebtedness secured by said Deed of Trust, advances thereunder, with interest as provided therein, and the unpaid principal of the Note secured by said Deed of Trust with interest thereon as provided in said Note, plus fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust.

DATED: March 24, 2010
RECONTRUST COMPANY NA, Trustee
2380 Performance Dr., TX 2-985-07-03
Richardson, TX 75082
Phone/Sale Information (800)281-8219


By: _____
    Melisa Martin, Team Member


RECONTRUST COMPANY NA is a debt collector attempting to collect a debt.  Any
information obtained will be used for that purpose.

# Exhibit A-5.   TRUSTEE'S DEED UPON SALE

"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"

RECORDING REQUESTED BY:
**RECONTRUST COMPANY**
AND WHEN RECORDED MAIL TO:
~~RECONTRUST COMPANY~~ *FNMA*
400 COUNTRYWIDE WAY  SV-35
SIMI VALLEY, CA 93065

*177-32-311-018*

Forward Tax Statements to Address listed above
TS No.  09-0095435
Title Order No.  090473897

Inst #: 201004200002464
Fees: $16.00 N/C Fee: $25.00
RPTT: $0.00 Ex: #002
04/20/2010 12:48:46 PM
Receipt #: 318932
Requestor:
FIDELITY NATIONAL DEFAULT S
Recorded By: KXC   Pgs: 4
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

### TRUSTEE'S DEED UPON SALE NEVADA

APN#    177-32-311-018

The amount of the unpaid debt was $ 200,393.37
The amount paid by the Grantee was $ 200,376.37
The property is in the city of LAS VEGAS, County of CLARK
The documentary transfer tax is $_____0_____.  The Grantee herein  was the beneficiary.
 RECONTRUST COMPANY, N.A., as the duly appointed Trustee, under a Deed of Trust referred to below,
and herein called "Trustee", does hereby grant without covenant or warranty to:  FEDERAL NATIONAL
MORTGAGE ASSOCIATION  herein called Grantee, the following described real property situated in
CLARK County, Nevada:
SEE ATTACHED LEGAL DESCRIPTION
This conveyance is made pursuant to the powers conferred upon Trustee by the Deed of Trust executed by
JAIME M BARAWID, AN UNMARRIED MAN, as Trustor, recorded on 11/30/2007, Instrument Number
0004854 (or Book 20071130, Page ) Official Records in the Office of the County Recorder of CLARK
County.   All requirements of law regarding the recording and mailing of copies of the Notice of Default
and Election to Sell, and the mailing, posting, and publication of the Notice of Trustee's Sale have been
complied with.  Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its power under
said Deed of Trust sold said real property at public auction on 04/13/2010.  Grantee, being highest bidder at
said sale became the purchaser of said property for the amount bid, which amount was $ 200,376.37.

**"This instrument is being recorded as an
ACCOMMODATION ONLY, with no
Representation as to its effect upon title"**

DATED:  April 14, 2010                    RECONTRUST COMPANY, N.A., Successor Trustee

BY: _K. Newland_

State of: _____**Texas**_____ )        **KATHY NEWLAND** Team Member
County of: _____**TARRANT**_____ )        **Assistant Secretary**

On 4|14|2010 before me _____**Karin Morris**_____, personally appeared
_____**KATHY NEWLAND, Asst SLC** know to me (or proved to me on the oath of _____ or
through _____ ) to be the person whose name is subscribed to the foregoing instrument and
acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.
Witness my hand and official seal.

_Karin Morris_

Notary Public's Signature

**KARIN ANNE MORRIS**
Notary Public, State of Texas
My Commission Expires
January 14, 2014

## EXHIBIT A

**REF. NO.: 09-0095435**

LOT TWO HUNDRED FIFTY-SEVEN (257) IN BLOCK "E" OF BELLA TERRA UNIT NO. 1 AT SOUTHERN HIGHLANDS AS SHOWN BY MAP THEREOF ON FILE IN BOOK 96 OF PLATS, PAGE 8 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

**STATE OF NEVADA**
**DECLARATION OF VALUE FORM**

1. Assessor Parcel Number(s)
   a. 177-32-311-018
   b.
   c.
   d.

2. Type of Property:

| | | | | | FOR RECORDER'S OPTIONAL USE ONLY |
|---|---|---|---|---|---|
| a. ☐ | Vacant Land | b. ☑ | Single Fam. Res. | Book: | Page: |
| c. ☐ | Condo/Twnhse | d. ☐ | 2-4 Plex | Date of Recording: | |
| e. ☐ | Apt. Bldg | f. ☐ | Comm'l/Ind'l | Notes: | |
| g. ☐ | Agricultural | h. ☐ | Mobile Home | | |
| ☐ | Other | | | | |

3. a. Total Value/Sales Price of Property                    $ 200,376.37
   b. Deed in Lieu of Foreclosure Only (value of property)    (                    )
   c. Transfer Tax Value:                                     $ 200,376.37
   d. Real Property Transfer Tax Due                          $ 0.00

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section   _2_
   b. Explain Reason for Exemption: Government Entity        Transfer to Government Entity

5. Partial Interest: Percentage being transferred: _____ %

   The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _____   Capacity  Grantor

Signature _____   Capacity  Grantee

| **SELLER (GRANTOR) INFORMATION** | **BUYER (GRANTEE) INFORMATION** |
|---|---|
| **(REQUIRED)** | **(REQUIRED)** |
| Print Name: ReconTrust Company, N.A. | Print Name: FMNA |
| Address: 400 Countrywide Way | Address: 400 Countrywide Way |
| City: Simi Valley | City: Simi Valley |
| State: California     Zip: 93065 | State: California     Zip: 93065 |

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buyer)**

Print Name: _FnDS_                       Escrow #: _090473897_
Address: 3220 El Camino Real
City: Irvine Ca 92602                     State: _____ Zip: _____

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

CCOR_DV_Form.pdf ~ 01/12/09